403 So.2d 893 (1981)
Richard ARRINGTON, Jr., in his capacity of Mayor of the City of Birmingham, et al.
v.
ASSOCIATED GENERAL CONTRACTORS OF AMERICA, Alabama Branch, Inc., et al.
80-261.
Supreme Court of Alabama.
August 21, 1981.
*894 James K. Baker, City Atty., Birmingham, for appellants.
T. M. Conway and Thomas A. Carraway of Rives, Peterson, Pettus, Conway, Elliott & Small, Birmingham, for appellees.
PER CURIAM.
Plaintiffs sought declaratory and injunctive relief from the operation of City of Birmingham Ordinance 77-257, as amended by Ordinance 79-140. Plaintiffs' suit challenges the amended ordinance as violative of state and federal statutes, as well as *895 state and federal constitutional provisions. Defendants' appeal is from a decree which adjudges the amended ordinance invalid and enjoins its enforcement. We affirm.

HISTORY OF THE CASE
In 1974, the Birmingham City Council adopted Ordinance 74-2, which required assurance of nondiscriminatory employment practices by those contracting with the City of Birmingham. Ordinance 74-2 was amended on May 3, 1977, by Ordinance 77-81 to include a requirement that, within thirty days of an award of a city contract, the contracting party provide an analysis of its workforce by race, sex, and national origin. Additionally, the amended ordinance authorized the mayor to "promulgate such additional rules and regulations as he [might] determine to be reasonably necessary to insure compliance with or to promote the objectives of" the amended ordinance.
In October 1977, former Birmingham Mayor David Vann, pursuant to the authority granted in Ordinance 77-81, instructed the city engineer to include in the bid specifications for city contracts a requirement that the general or prime contractor agree to expend at least ten percent of the contract amount with certain minority subcontractors or suppliers. The specification had its genesis in the 1977 Public Works Employment Act, popularly known as the PWEA, 42 U.S.C. § 6701, et seq. (Supp. III 1979). The PWEA required that a local government unit awarded PWEA funds assure that at least ten percent of the contract amount would be expended with minority business enterprises.
On November 30, 1977, Associated General Contractors of America, Alabama Branch, Inc., along with several contractors doing business in the Birmingham area, brought suit against Birmingham, its mayor, and other city officials, seeking to have declared invalid Ordinance 77-81 and the mayor's regulation requiring the ten percent minority commitment. Additionally, plaintiffs sought an order preliminarily enjoining defendants' enforcement of the ordinance and the mayor's regulation. Plaintiffs' complaint alleged that the city's ordinance and regulation violated the due process and equal protection guarantees of the federal and state constitutions, federal statutes forbidding discrimination on account of race, and the state competitive bid law. After a hearing, the circuit court entered an order denying plaintiffs' motion to preliminarily enjoin enforcement of Ordinance 77-81, but granting plaintiffs' motion to preliminarily enjoin enforcement of the mayor's regulation.
Nine days after the circuit court declared the mayor's regulation void and enjoined its enforcement, the Birmingham City Council adopted Ordinance 77-257. Later, on August 28, 1979, the Council amended the ordinance to change certain bid requirements and to provide further for waiver of the ordinance provisions. Shortly thereafter, following the election of Richard Arrington, Jr., to succeed David Vann as Mayor of Birmingham, plaintiffs sought to permanently enjoin the enforcement of Ordinance 77-257, as amended, by amending their complaint of November 30, 1977, to put at issue the validity of the amended ordinance and to substitute the then appropriate city officials as parties defendant.
The amended complaint charged that the ordinance violated the equal protection and due process guarantees of the state and federal constitutions, as well as 42 U.S.C. §§ 1981 and 1983 (1976 Ed.); 42 U.S.C. §§ 2000d to d-4 (1976 Ed.); and the Alabama Competitive Bid Law, Code 1975, § 41-16-50 (Supp.1980). Defendants put at issue each count of plaintiff's complaint, and after a hearing on the merits, the trial court, with findings of fact and conclusions of law, found for plaintiffs and permanently enjoined enforcement of the challenged ordinance. This appeal resulted.

*896 THE CHALLENGED ORDINANCE
Ordinance 77-257, as amended by Ordinance 79-140,[1] commences with a finding that, due to historical patterns and practices of racial discrimination, minority business enterprises (MBE) have not obtained an *897 equitable share of contracts or subcontracts let by the City of Birmingham. The ordinance further finds that official policies of overt discrimination against minorities have ceased, but that existing policies and programs of the City have not eliminated the lingering effects of such past discrimination. As set forth in the ordinance, the purpose of the enactment was to "encourage, facilitate and effect greater participation by minority business enterprises in construction contracts let by the city."
A "minority business" is defined by the ordinance to be any business enterprise in which minority group members hold at least fifty percent ownership or, in the case of a publicly owned business, one in which at least fifty-one percent of the stock is owned by minority group members. "Minority group members," as used in the ordinance, means United States citizens who are Blacks, Spanish speaking, Orientals, Indians, Eskimos, or Aleuts. For all construction contracts let by the City and exceeding the amount of $20,000, the ordinance sets a goal of fifteen percent to be expended with bona fide MBE contractors, subcontractors, or suppliers of goods or services. The ordinance requires that a contractor make a good faith effort to meet the fifteen percent goal. However, the inclusion with the contractor's bid of a specific plan to expend at least ten percent of a contact amount with MBEs is accepted as sufficient evidence of a good faith effort to meet the fifteen percent goal.
Any bid not accompanied by a list of proposed MBE subcontractors is considered nonresponsive, unless accompanied by a request for a waiver. Under the ordinance provisions, a contractor may be granted a waiver of the MBE participation requirements for the following reasons:
(1) Lack of a qualified MBE in the Birmingham Standard Metropolitan Statistical Area.
(2) Inability to obtain reasonably competitive prices from available MBEs in the Birmingham Standard Metropolitan Statistical Area.
(3) Failure of MBEs to give notice of their desire to participate as subcontractors with respect to a specific contract.
Each time a contractor makes a request for payment under the contract, he must submit a signed writing which lists his participating minority subcontractors, the work they performed and the amounts paid to them. Finally, the ordinance provides that a contractor's noncompliance with ordinance terms constitutes a breach of the contract by the contractor.

FINDINGS OF THE TRIAL COURT
The circuit court found as follows:
The evidence shows that it is the practice of the Plaintiff contractors not to make an open solicitation of subcontractor bids but to deal and subcontract with firms seeking subcontract work from the contractor or to seek prices from subcontractors with whom the contractor has had experience... as to quality of work, performance and ability to obtain bonds. Since the implementation of the Ordinance, it has been shown the procedures required by the City have been time consuming at a cost to the contractor but without meaningful interest or participation by potential MBEs, if in fact available.
The Ordinance and City procedure have established the pre-bid conference to be a "hiring hall" to bring prospective contract bidders and qualified MBEs together so that each may become aware of the other's interest in a particular contract to be let and to provide information to all as *898 to generalities of the proposed construction. If no MBE gives written notice of a desire and ability to participate in respect to the contract discussed at the pre-bid conference, all contractors are entitled to an MBE waiver in accordance with the Ordinance.
Notwithstanding this procedure, the evidence has shown that few, if any, MBEs actually attend the pre-bid conferences. This non-attendance, however, has not resulted in the automatic granting of waivers. Instead, the City has required a detailed demonstration by the contractor that a qualified MBE is not available. The Ordinance has been interpreted by the administering city officials to require 10% MBE commitment and participation. This practice has resulted in the Ordinance being a mandatory quota with a waiver provision instead of a goal. A close reading of the interaction of the Ordinance provisions leads to a similar conclusion.
It has further been shown that the affirmative action aspects of the Ordinance and its administration have created MBE brokerage businesses. The sole participation in City contracts of these businesses is to provide a business entity or front as an MBE who receives a subcontract, generally for materials, adds a commission and, thereafter, subcontracts ... the purchase to a bona fide subcontractor or supplier. This practice has been brought to the attention of the administering City officials, but no evidence has been presented that this abuse has been stopped or attempted to be stopped. These MBE commission brokers are a fraud on the legitimate minority businesses and the taxpaying public.

COMPETITIVE BID LAW CLAIMS
Plaintiffs assert that Ordinance 77-257, as amended, conflicts with Code 1975, § 41-16-50 (Supp.1980), which provides in part:
§ 41-16-50. Contracts for which competitive bidding required; manner of awarding contracts generally; award of contracts to resident bidders; negotiation of contracts; joint contracts.
(a) All expenditure of funds of whatever nature for labor, services or work, or for the purchase or lease of materials, equipment, supplies or other personal property involving $2,000.00 or more, made by or on behalf of ... the governing bodies of the municipalities of the state and the governing boards of instrumentalities of counties and municipalities, including waterworks boards, sewer boards, gas boards and other like utility boards and commissions ... shall be made under contractual agreement entered into by free and open competitive bidding, on sealed bids, to the lowest responsible bidder. ...
Code 1975, § 41-16-50(a) (Supp.1980).
Plaintiffs complain that, contrary to the statutory mandate, the ordinance requirements not only inhibit fair and open competitive bidding, but also may result in the award of a city contract to someone other than the lowest responsible bidder.
This Court has not had occasion to construe § 41-16-50; however, we have interpreted the statute governing competitive bidding on state contracts, i. e. § 41-16-20. Section 41-16-20, like § 41-16-50, requires that the contract be awarded to the lowest responsible bidder in open competitive bidding, see, Code 1975, § 41-16-20 (Supp. 1980), and we believe cases construing § 41-16-20 are instructive in the instant case.
In White v. McDonald Ford Tractor Co., 287 Ala. 77, 248 So.2d 121 (1971), this Court recognized the state authorities' broad discretion in determining whether a bidder is the lowest responsible bidder. The Court indicated, however, that the authorities' discretion is not unbounded. The Court said:
[W]e do not mean to imply that this Court or some other court would not have the authority to declare a contract as being void because the "specifications" were written in such a manner that full and fair competition was excluded. It is fair to say that the legislative intent in passing the Competitive Bid Law was to *899 get the best quality equipment at the lowest possible price, and the executive authorities should carry out this intent of the legislature.
287 Ala. at 86, 248 So.2d at 129.
While bid specifications are permissible where their purpose is reasonably related to contract requirements or the quality of the product or service in question, we believe that intrusive specifications wholly unrelated to contract requirements or to product suitability or quality unduly inhibit fair and open competition.
Defendant Birmingham contends that the evidence shows the ordinance has never been applied so as to exclude the lowest responsible bidder. The ordinance, however, does not require that the lowest responsible bid be accepted. Indeed, under the ordinance, the lowest bid is not considered at all unless it is accompanied either by a waiver request, or by a list of proposed MBE subcontractors. Additionally, the ordinance deters participation in the bidding process because, as the circuit court found, the ordinance requirements are time consuming and costly to contractors. As a result, we hold that the ordinance frustrates the open competitive bidding process required by Code 1975, § 41-16-50 (Supp. 1980).
Of course, it is of no consequence that the ordinance contravenes the competitive bidding statute if the ordinance provisions are required by the United States Constitution. That is, the dispositive issue is whether Birmingham's affirmative action program is constitutionally required or whether the program is merely constitutionally permissible. Our study of recent federal decisions convinces us that the program is not constitutionally required, and, furthermore, even if some affirmative action program were required, we believe that the program here imposed is not constitutionally sound.
The case of Associated General Contractors v. San Francisco Unified School District., 616 F.2d 1381 (9th Cir.), cert. denied, ___ U.S. ____, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980), provides guidance for our resolution of the question. In that case, plaintiffs challenged an affirmative action policy adopted by the San Francisco Board of Education. Under the policy, the school district was required to award twenty-five percent of the dollar volume of certain construction contracts to minorities, either by letting the contract to a minority general contractor, or by requiring the general contractor to utilize the specified percentage of minority subcontractors. The twenty-five percent set-aside applied only to projects funded by PWEA funds, although receipt of PWEA funds was conditioned on a minority participation of only ten percent. The district court held the set-aside illegal, except as to the ten percent minority participation requirement for federally funded projects, and the school board appealed.
The United States Court of Appeals for the Ninth Circuit found the minority participation requirement in conflict with the California Education Code, which requires that a construction contract be awarded to the "lowest responsible bidder." Furthermore, the Court sustained the code provision against constitutional attack on the basis of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), finding the competitive bid law race-neutral on its face and without discriminatory purpose. Finally, the Court found no constitutional duty to institute "stacked deck" affirmative action programs, that is, programs which deny some nonminorities the relevant benefit by imposing a preference for minorities. Since the affirmative action program was not constitutionally compelled, the competitive bid provision of the California Education Code was a constitutional exercise of state power, and the Court of Appeals affirmed the district court's decision by holding that the set-aside policy violated the California Code provision.
We believe the San Francisco Unified School District case is in all material respects factually identical to the case at bar. Although in that case the affirmative action program was imposed by an agency having no legislative powers, rather than, as here, by a city council having limited *900 legislative power, a city council has no more authority than an agency to initiate programs in violation of state law or policy. See, Busch Jewelry Co. v. City of Bessemer, 269 Ala. 180, 112 So.2d 344 (1959), City of Mobile v. Madison, 40 Ala.App. 713, 122 So.2d 540 (1960). Thus, we follow the Ninth Circuit interpretation of relevant case law to conclude that Birmingham Ordinance 77-257, as amended, is invalid because the ordinance contravenes Code 1975, § 41-16-50 (Supp.1980), without constitutional justification.

FEDERAL CONSTITUTIONAL AND STATUTORY CLAIMS
Even assuming either the nonexistence or the unconstitutionality of the competitive bid law, still Ordinance 77-257 must itself pass constitutional muster before its provisions can stand. We believe that the affirmative action program proposed by the ordinance does not comport with the constitutional requirements announced in Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), and Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Specifically, we hold that the ordinance violates Title VI and the Equal Protection Clause of the 14th Amendment because (1) the Birmingham City Council is not a competent body to identify and address past constitutional or statutory violations; (2) even if the council were a competent body to identify and address past constitutional or statutory violations, the council has not compiled the necessary record to demonstrate the need for the affirmative action program; and (3) even if the council were a competent body which had compiled the necessary record to demonstrate the need for an affirmative action program, the remedy imposed is not carefully tailored to rectify the continuing effects of past illegal discrimination.
Neither Fullilove nor Bakke gives this Court an absolute statement as to the equal protection analysis which should be applied in cases which question the constitutionality of affirmative action programs. Nevertheless, we believe that the approach of Justice Powell is fairly representative of a more rigorous standard of review, and for purposes of this opinion we will employ the analytical framework proposed by him.
We are reluctant to belabor the reader by quoting Justice Powell at length; however, we recognize that he most succinctly states his own reasoning and approach in cases involving equal protection challenges to governmentally imposed race preferences. For example, in the Fullilove case, Justice Powell wrote:
The question in this case is whether Congress may enact the requirement in § 103(f)(2) of the Public Works Employment Act of 1977 (PWEA), that 10% of federal grants for local public work projects funded by the Act be set aside for minority business enterprises. Section 103(f)(2) employs a racial classification that is constitutionally prohibited unless it is a necessary means of advancing a compelling governmental interest .... For the reasons stated in my Bakke opinion, I consider adherence to this standard as important and consistent with precedent.
. . . .
Racial preference never can constitute a compelling state interest. "`Distinctions between citizens solely because of their ancestry' [are] `odious to a free people whose institutions are founded upon the doctrine of equality.'" Loving v. Virginia, 388 U.S. [1], at 11, [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] quoting Hirabayashi v. United States, 320 U.S. 81, 100, [63 S.Ct. 1375, 1385, 87 L.Ed. 1774]. Thus, if the set-aside merely expresses a congressional desire to prefer one racial or ethnic group over another, § 103(f)(2) violates the equal protection component in the Due Process Clause of the Fifth Amendment. ...
The Government does have a legitimate interest in ameliorating the disabling effects of identified discrimination. ... The existence of illegal discrimination justifies the imposition of a remedy that will "make persons whole for injuries suffered *901 on account of unlawful ... discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 [95 S.Ct. 2362, 2372, 45 L.Ed.2d 280] (1975). A critical inquiry therefore, is whether § 103(f)(2) was enacted as a means of redressing such discrimination. But this Court has never approved race-conscious remedies absent judicial, administrative, or legislative findings of constitutional or statutory violations....
Because the distinction between permissible remedial action and impermissible racial preference rests on the existence of a constitutional or statutory violation, the legitimate interest in creating a race-conscious remedy is not compelling unless an appropriate governmental authority has found that such a violation has occurred. In other words, two requirements must be met. First, the governmental body that attempts to impose a race-conscious remedy must have the authority to act in response to identified discrimination. ... Second, the governmental body must make findings that demonstrate the existence of illegal discrimination....
Our past cases also establish that even if the government proffers a compelling interest to support reliance upon a suspect classification, the means selected must be narrowly drawn to fulfill the governmental purpose....
Fullilove v. Klutznick, 448 U.S. at 496-498, 100 S.Ct. at 2784-2785 (Powell, J., concurring) (citations and footnotes omitted). See also, Regents of the University of California v. Bakke, 438 U.S. at 287-320, 98 S.Ct. at 2746-2763.
Thus, when affirmative action programs are challenged, the questions are whether:
(1) The governmental body imposing the plan has the authority and capability to remedy past constitutional or statutory violations;
(2) The body compiled the record necessary to support the conclusion that past illegal conduct existed and that adverse residual effects of the conduct continue to exist; and
(3) The plan imposed is narrowly tailored to address the residual effects of the identified past violations.
Undoubtedly the Ordinance 77-257 set-aside is a racial classification resulting in a discriminatory preference for the named minority groups. Although the ordinance states that the racial preference is a goal, rather than a mandatory quota, nevertheless, a contractor is required to submit, along with his bid, either a specific plan for ten percent MBE participation in the contract, or a request for administrative waiver of the ten percent requirement. The result is that ten percent of city construction work, by dollar amount, is reserved for minority businesses.
The City's stated purpose for imposing the racial classification was to "encourage, facilitate and effect greater participation by minority business enterprises in construction contracts let by the city." While the City's purpose is meritorious, it is indeed a grave measure to accomplish that purpose through discrimination against nonminorities. For this reason, the reallocation of burdens and benefits by the ordinance classification is constitutionally permissible only as the remedial response to specific illegal action against those to be benefited by the classification.
Necessarily, the Birmingham City Council must be invested with some remedial power before it can properly identify and redress past illegal conduct. Defendant Birmingham contends that the City Council, having limited police powers, is an entirely appropriate and competent body to find and address constitutional and statutory violations. In this case, we disagree.
Here, we are dealing neither with the broad remedial powers of Congress conferred by the 13th, 14th, and 15th Amendments, cf. Fullilove v. Klutznick, 448 U.S. at 483, 100 S.Ct. at 2777; 448 U.S. at 500, 100 S.Ct. at 2786 (Powell, J., concurring), nor with the limited powers of a court. Cf., Franks v. Bowman Transport Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). As Justice Powell said, "[I]solated segments *902 of our vast governmental structures are not competent to make ... decisions [as to the propriety of race-conscious remedial action], at least in the absence of legislative mandates and legislatively determined criteria." Regents of the University of California v. Bakke, 438 U.S. at 309, 98 S.Ct. at 2757 (footnote omitted). The governmental entity involved here, a municipality, derives all of its power from the state, and no municipality can legislate beyond what the state has either expressly or impliedly authorized. Colvin v. Ward, 189 Ala. 198, 66 So. 98 (1914). We see nothing in the limited police power granted municipalities by the state to warrant the conclusion that municipalities possess the broad remedial power to vindicate constitutional or statutory violations by employing racially discriminatory preferences, but we are not now called upon to answer that question. Certainly the state has not granted cities the power to initiate legislation in direct contravention of state law and policy favoring open competitive bidding on city contracts.
Even assuming the Birmingham City Council were competent to act, we believe the council failed to compile the necessary record to justify the ordinance. Although the ordinance commences with a declaration that historical practices of racial discrimination have resulted in minorities' receiving an inequitable share of city construction contracts, we interpret the pertinent case law to require more than a conclusory legislative preamble to justify the council's imposition of discriminatory racial classifications.[2] To hold that race-conscious remedies may be imposed without competent and particularized findings of record "would be to convert a remedy heretofore reserved for violations of legal rights into a privilege that all institutions throughout the Nation could grant at their pleasure to whatever groups are perceived as victims of societal discrimination." Regents of the University of California v. Bakke, 438 U.S. at 310, 98 S.Ct. at 2758. If all that is required is some statement of justification, unsupported by studies or hearings of record, then there is no substance to the requirement that the race-conscious remedy be justified by findings of past discrimination.[3]
Defendant Birmingham presented no evidence that the ordinance was the considered response to hearings, reports, debates, or empirical studies. In fact, those persons primarily responsible for implementation and enforcement of the ordinancethe former city engineer, the acting city engineer, and the purchasing agentall testified that they knew of no studies conducted to determine the need or justification for the ordinance. The record reflects that the ordinance was passed shortly after the circuit court's injunction against enforcement of the mayor's regulation requiring ten percent MBE participation. The council appears to have simply adopted the voided regulation, with some minor substantive changes and post hoc findings of past discrimination. As far as the record shows, Birmingham failed to establish that the findings were anything other than an unsubstantiated conclusion by the council.
Our opinion is not changed by the argument that the council was, by its findings, simply admitting its own past wrongs. The *903 council members cannot speak for past city administrations and officials. Furthermore, even if it were appropriate for the City to admit its own misdeeds, absent sufficient findings, it was inappropriate and unnecessary for the City to acknowledge that discrimination has existed in Birmingham; however, past societal discrimination alone is insufficient justification to support the specific remedy dictated by the ordinance set-aside. See, 438 U.S. at 310, 98 S.Ct. at 2758.
We also conclude that Ordinance 77-257 is not narrowly drawn to advance the purported objective of ameliorating the effects of past discrimination. A glance at the ordinance suffices to establish that it was not drafted to address identified past discrimination. Included as beneficiaries of the ordinance are individuals who are "Blacks, Spanish speaking, Orientals, Indians, Eskimos, and Aleuts." Assuming that the city council had sufficient evidence before it to justify a race-conscious preference for Blacks, nothing in the record supports the conclusion that the other named minority groups were entitled to remedial relief. Cf., Fullilove v. Klutznick, 448 U.S. at 537-9, 100 S.Ct. at 2805-06 (Stevens, J., dissenting).
The United States Supreme Court and other courts have considered various factors when deciding whether a race-conscious plan is sufficiently narrow to comport with equal protection guarantees. Factors considered are "(i) the efficacy of alternative remedies ... (ii) the planned duration of the remedy ... (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or workforce ... and (iv) the availability of waiver provisions if the hiring plan could not be met." 448 U.S. at 510-11, 100 S.Ct. at 2791 (Powell, J., concurring). We believe that, viewed in light of these factors, the ordinance must fall.
We do not rule on the efficacy of non-discriminatory alternatives. At trial the issue was contested, but the trial judge did not rule on the question. Additionally, we do not address the issue of the availability of a waiver of ordinance requirements. The ordinance provisions include a waiver, although the plaintiffs contend the waiver is not applied as set down in the ordinance.
However, using factors considered by other courts, we note several infirmities in the ordinance set-aside plan. The ordinance has no time limit, and presumably the ten percent set-aside will remain in force until repealed. Additionally, there is no evidence of written regulations or guidelines. Implementation and enforcement of the ordinance are left to the discretion of administering officials. Finally, there is no indication in the record that the ten percent MBE set-aside has any relationship to the number of minority contractors available and equipped to do city construction work. Certainly, the ordinance is demonstrably broader than necessary.
Defendant Birmingham argues that Fullilove is dispositive of every issue in this case and is absolute authority that the ordinance set-aside is constitutional. In Fullilove, the Court upheld the ten percent set-aside proposed by the Public Works Employment Act of 1977. Since the Birmingham ordinance is modeled on the federal law, defendant continues, the ordinance is undoubtedly constitutional.
Although Fullilove is guidance for our resolution of the issues in this case, the result in Fullilove does not dictate our result here. In short, Fullilove turned on the Congressional authority to legislate race-conscious remedial measures. The Congressional authority is rooted in the 13th, 14th, and 15th Amendments, and without doubt the City of Birmingham has no coextensive power. Furthermore, the PWEA was limited in duration, and its provisions were implemented through extensive regulations. Although the factual differences between the instant case and Fullilove seem few, they are material.
In conclusion, we note that our decision does not and cannot foreclose the City's enforcement of federal statutes or constitutionally imposed administrative regulations. Nor do we conclude that no municipality or *904 state governmental entity may initiate a constitutionally sound affirmative action program. We only decide the case before us.
AFFIRMED.
TORBERT, C. J., and MADDOX, FAULKNER, ALMON and EMBRY, JJ., concur.
JONES, SHORES and BEATTY, JJ., dissent.
ADAMS, J., not sitting.
JONES, Justice (dissenting).
I would reverse on the authority of Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In my opinion the trial court's reliance upon Central Alabama Paving, Inc. v. James, 499 F.Supp. 629 (M.D.Ala.1980), is misplaced. The following observation from James distinguishes it from the instant case:
If the "set-aside" or goals or quotas prescribed in this case by DOTat least to the extent that they applied to racial minoritieshad been enacted by Congress, this Court would feel bound by Fullilove and would hold such goals to be consistent with the Constitution.
Fullilove, therefore, constrains me to uphold the constitutional validity of the challenged ordinance, a lawful exercise of the City's legislative prerogative. See also, Local Union No. 35 v. City of Hartford, 625 F.2d 416 (2d Cir. 1980), cert. denied, ___ U.S. ____, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).
SHORES and BEATTY, JJ., concur.
NOTES
[1] Ordinance 77-257, as amended, provides:

Participation By Minority
Business Enterprises in
Construction Contracts
Sec. 4-1-51 Findings and purpose.
(a) Due to historical patterns and practices of racial discrimination, minority business enterprises have not obtained an equitable share of contracts or subcontracts let by the city for construction and for the purchase of goods, materials, equipment or services. Though past official policies of overt discrimination against minorities have now ceased, the existing policies and programs of the city have not effectively eliminated the lingering present effects of this past discrimination. The city has a compelling interest in eradicating the present effects of past discrimination, and in promoting equality of economic opportunity among and between all of its citizens. Because approximately 50 percent of Birmingham's citizens are racial minority citizens, the economic improvement and advancement of the minority community is vital to the economic health of the community as a whole and promotes the general health and welfare of all citizens of the city.
(b) The purpose of this article is therefore to encourage, facilitate and effect greater participation by minority business enterprises in construction contracts let by the city and boards and agencies thereof. For purposes of this section, "minority business" means any business enterprise, whether individually owned or a partnership, joint venture or corporation, at least 50 percent of which is owned by minority group members, or, in the case of a publicly-owned business, at least 51 percent of the stock is owned by minority group members. "Minority group members" are citizens of the United States who are Blacks, Spanish speaking, Orientals, Indians, Eskimos and Aleuts.
Sec. 4-1-52 Goal of fifteen percent participation established.
(a) It is a goal of the City of Birmingham that at least 15 percent of each construction contract let by the city, the amount of which exceeds $20,000, be expended with bona fide minority business enterprises as contractors and subcontractors or suppliers of goods or services. Each contractor bidding on a city construction contract shall be required to make a good faith effort to achieve such goal. The inclusion with the contractor's bid of a specific plan to expend at least 10 percent of a contract amount with minority business enterprises shall be accepted as sufficient evidence of a good faith effort to meet such goals. Provided, however, that as to such construction contracts of $100,000 or more, excepting contracts let for street or sewer improvements, no more than 50 percent of such plan for minority business participation shall be for the supply of goods or materials unless a waiver of this provision is obtained from the city engineer as hereinafter provided in subsection (c) hereof.
(b) Each bidder for such a contract with the City of Birmingham must submit with his bid a listing of each minority business enterprise and the work proposed to be performed or the goods or services proposed to be furnished by each and the price contracted therefor. The bid of any bidder not providing this information shall be considered non-responsive.
(c) At or before the time for filing the statement required by subparagraph (b) above, a written request for a waiver or partial waiver of the goal may be submitted to the city engineer. Each contractor requesting a waiver shall be afforded an opportunity by the city engineer to present evidence supporting his request for such waiver and be furnished a written ruling upon such request within two (2) days (Saturdays and Sundays and city holidays excluded) of the time of receipt of such request. The city engineer may grant a waiver for either of the following reasons:
(1) Lack of qualified minority business enterprises in the Birmingham Standard Metropolitan Statistical Area (SMSA).
(2) Inability to obtain reasonably competitive prices from the available minority business enterprises in the Birmingham Standard Metropolitan Statistical Area (SMSA), based on prevailing prices on the open market as determined by the city engineer. In all cases where a waiver is requested on the basis that the bid of a minority business enterprise is excessive, there shall be submitted to the city engineer at the time of such request a statement signed by the person requesting the waiver listing the names and bid amount of each person or firm bidding on the same portion or part of the contract as bid by such minority business enterprise.
Where no minority business enterprise or its authorized representative gives written notice of a desire and ability to participate as a subcontractor or supplier of goods or services with respect to a specific contract at the pre-bid conference with respect thereto or by 10:00 a. m. of the second day (Saturdays, Sundays, and city holidays excluded) following such pre-bid conference, each contractor submitting a bid shall be entitled to a waiver.
(d) Upon each request for payment under the contract, each contractor must provide to the city engineer in a signed writing the name or names of minority enterprises participating in the contract, the nature of the work or services such enterprises have performed or provided, and the amounts paid to such enterprises at the time of such request.
(e) Failure to comply with the terms of this article or to utilize (as may be modified by the waiver) minority business enterprises as stated in the bid shall constitute a breach of contract with the City of Birmingham, upon which breach the city shall have the right to cancel the contract, or to withhold from unpaid sums under the contract such amounts as may be necessary to complete the work contracted for with appropriate minority business enterprise participation, should the contractor fail to fully correct such breach within 15 days of written demand for such correction by the city engineer. (Ord. No. 77-257, as amended by Ord. No. 79-140, 8/28/79).
[2] The exactitude with which constitutional or statutory violations must be identified may vary with the nature and authority of the governmental body involved. Fullilove v. Klutznick, 448 U.S. at 515 n. 14, 100 S.Ct. at 2794 (Powell, J., concurring). See, 448 U.S. at 477-8, 2773-75. In view of the limited power conferred upon municipal governments, we believe that, before initiating an affirmative action program such as the one before us, the Birmingham City Council must compile a record to support a finding of past illegal discrimination.
[3] As was said by Justice Powell,

Race-conscious remedies, popularly referred to as affirmative-action programs, almost invariably affect some innocent persons.... Respect and support for the law, especially in an area as sensitive as this, depend in large measure upon the public's perception of fairness.... It therefore is important that the legislative record supporting race-conscious remedies contain evidence that satisfies fairminded people that the [legislative] action is just.
Fullilove v. Klutznick, 448 U.S. at 506, n. 8, 100 S.Ct. at 2789, n. 8 (Powell, J., concurring).