**ADVANCE TANK AND CONSTRUCTION COMPANY, INC.,**
**Plaintiff–Appellee,**

v.

**ARAB WATER WORKS, a Board or Agency of The City of Arab, Alabama, Arnold McDaniel, as Chairman of the Arab Water Works Board, Arlon Wheeler and H.E. Barker, as members of the Arab Water Works Board, Defendants–Appellants.**

No. 89–7443.

United States Court of Appeals,
Eleventh Circuit.

Sept. 5, 1990.

Mark W. Lee, Parsons, Lee & Juliano, P.C., Birmingham, Ala., Dave Beuoy, Burke & Beuoy, Arab, Ala., for defendants-appellants.

John Martin Galese, Galese & Moore, Birmingham, Ala., for plaintiff-appellee.

Before EDMONDSON, Circuit Judge, HILL * and HENDERSON, Senior Circuit Judges.

HILL, Senior Circuit Judge:

## INTRODUCTION

On January 31, 1989, the Arab Water Works Board (hereinafter "Board") of Arab, Alabama, opened sealed bids for the construction of an addition to a water treatment plant. Appellee Advance Tank and Construction Company (hereinafter "Advance Tank") submitted the apparent low bid of $3,984,375.00. The firm of Brasfield & Gorrie, Inc., submitted the second lowest bid at $4,068,000.00.[1] The Board understood that the bids were firm for a period of sixty days. On March 29, 1989, the Board rejected Advance Tank's bid and thereafter awarded the contract to Brasfield & Gorrie.

On April 5, 1989, Advance Tank brought suit in the United States District Court for the Northern District of Alabama, seeking damages under 42 U.S.C. § 1983,[2] and injunctive relief under the Alabama Competitive Bid Law, see Ala.Code § 41–16–61 (1975).[3] See generally, sections 41–16–1 through 41–16–82.[4]

After a three-day bench trial, the district court enjoined the execution of the contract between the Board and the second lowest bidder, Brasfield & Gorrie. The Board filed a timely appeal to this court and we reverse the district court's judgment.

The sole issue in this appeal is whether the district court erred in finding that the board violated Alabama Code § 41–16–50(a).[5] The trial court made sev-

---

\* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. Appellant's brief states that Advance Tank submitted a requested alternative bid of $3,863,-075.00, while Brasfield & Gorrie submitted an alternative bid of $3,908,000.00, and that the Board awarded the contract on the basis of the alternative bids. Appellant suggests that the difference between the two bids was $44,925.00 ($3,908,000.00 minus $3,863,075.00), rather than $83,625.00 ($4,068,000 minus $3,984,375.00). The record indicates that the Board awarded the contract on the basis of the regular bids, and that the difference between the bids was $83,-625.00, rather than $44,925.00. Thus, the Board accepted a bid that was slightly more than two percent higher than the lowest bid.

2. The district court dismissed the section 1983 claim for damages under Federal Rule of Civil Procedure 41(b) at the close of plaintiff's case-in-chief. See Urban Sanitation Corp. v. City of Pell City, 662 F.Supp. 1041 (N.D.Ala.1986), aff'd without opinion 823 F.2d 556 (11th Cir.1987). Plaintiff-appellee does not cross-appeal this ruling by the district court.

3. Section 41–16–61 grants standing to any bona fide unsuccessful bidder to seek an injunction against the execution of a contract entered into in violation of the Alabama Competitive Bid Law.

4. The district court assumed diversity jurisdiction under 28 U.S.C. § 1332, since Advance Tank is a Wyoming corporation, while the Board and its members are "residents" of the state of Alabama for diversity jurisdiction purposes. The court also assumed jurisdiction under 28 U.S.C. § 1331 on the basis of the alleged section 1983 violation.

5. Appellant's Brief and the district court's findings refer to sections 41–16–20 and 41–16–31. These provisions are virtually identical to sections 41–16–50 and 41–16–61, with the exception that the latter two provisions apply to specific state and municipal agencies, including "waterworks boards," while the former two provisions apply generally to state-controlled organizations. This distinction does not affect the instant case. See Arrington v. Associated Gen. Contractors of Am., 403 So.2d 893, 898 (Ala. 1981).

eral factual findings with regard to the Board's reasons for rejecting Advance Tank's bid; we review these findings under the clearly erroneous standard. Fed.R. Civ.P. 52(a); C. Wright & A. Miller, *Federal Practice and Procedure* § 2585 (1971). We regard the question of whether the Board's decision to reject Advance Tank's bid violated the Alabama Competitive Law as a legal question subject to plenary review by this court.[6]

## DISCUSSION

" '[T]he legislative intent in passing the Competitive Bid Law was to get the best quality equipment [or public construction] at the lowest possible price.' " *Mobile Dodge, Inc. v. Mobile County*, 442 So.2d 56, 58 (Ala.1983) (quoting *White v. McDonald Ford Tractor Co.*, 287 Ala. 77, 86, 248 So.2d 121, 129 (1971)) (hereinafter *"McDonald"*); *Arrington v. Associated Gen. Contractors of Am.*, 403 So.2d 893, 898–99 (Ala.1981). *See Carson Cadillac Corp. v. City of Birmingham*, 232 Ala. 312, 316, 167 So. 794, 798 (1936) (hereinafter *"Carson"*) (construing predecessor competitive bidding statute).

Section 41–16–50(a) states that a "waterworks" board must submit expenditures "for labor, services, or work, [etc.]" in excess of $5,000.00[7] to an open competitive bidding process, and must award the contract to the "lowest responsible bidder." The Alabama Supreme Court has made clear that "[t]he Competitive Bid Law does not require that the lowest bid be accepted." *Int'l Telecommunications Systems v. State*, 359 So.2d 364, 366 (Ala.1978). *See McDonald*, 287 Ala. at 81, 248 So.2d at 124 ("being the *lowest bidder* does not auto-

matically entitle the bidder to the award") (emphasis in original).

■ The particular statutory provision at issue in this case does not provide on its face a specific standard by which a court, or a governmental body for that matter, should determine whether a bidder is "responsible." With regard to the purchase of "commodities" through competitive bidding, section 41–16–57(a) states that "awards shall be made to the lowest responsible bidder taking into consideration the qualities of the commodities proposed to be supplied, their conformity with specifications, the purposes for which required, the terms of delivery, transportation charges and the dates of delivery." No such precise language illustrates the standard by which a state or municipal instrumentality should determine whether a bidder is "responsible" when the bid's subject matter is "labor, services or work" necessary for the construction of a public utility.[8] We conclude, however, that the Alabama legislature intended that public contracting authorities should adapt and apply the above considerations as general guidelines by which to determine whether a bid is "responsible" in light of the particular subject matter of any contract to which the statute applies.

■ With regard to the construction of an extension to an existing water treatment plant, section 41–16–57(a) suggests by analogy that a "waterworks" board should consider (1) the quality of a bidder's past work in connection with the same or similar type of construction as proposed in the invitation for bids, (2) the conformity of the bidding contractor to the particular specifications for bidders, (3) the purpose for which the construction services are required, and (4) any other considerations

6. As explained in the text below, we approach the legal question in this case with full appreciation of the district court's role as the finder of facts. We do not detect that any of the district court's factual findings are clearly erroneous.

7. On May 11, 1989, shortly after appellee filed its complaint in this case, the Alabama legislature amended section 41–16–50, increasing the

expenditure amount that triggers the competitive bidding requirement from $3,000.00 to $5,000.00. 1989 Ala.Acts No. 89–687, § 3. *See* Ala.Code § 41–16–50(a) (1989 Supp.).

8. The construction of a public utility is of course not a "commodity." *Cf. Tin Man Roofing v. Birmingham Bd. of Educ.*, 536 So.2d 1383

unique to the type of services sought.[9]

■ In a number of cases, the Alabama Supreme Court has reiterated that a court should not disturb a governmental body's determination of whether the apparent low bidder is "responsible" unless the decision was arbitrary and capricious.[10] *Mobile Dodge,* 442 So.2d at 58; *Int'l Telecommunications Systems,* 359 So.2d at 367; *McDonald,* 287 Ala. at 86, 248 So.2d at 127; *Mitchell v. Walden Motor Co.,* 235 Ala. 34, 38, 177 So. 151, 154 (1937) (hereinafter *"Walden"*); *Carson,* 232 Ala. at 317, 167 So. at 798 (1936); *Inge v. Board of Public Works,* 135 Ala. 187, 33 So. 678, 681 (1903).[11] The Court has also expressed the threshold for proper "responsible bid" determinations as an "absence of fraud or gross abuse [of discretion]." *Carson,* 232 Ala. at 317, 167 So. at 798.

■ The above decisions suggest that a court should make two distinct inquiries: it should determine whether the decision to reject the apparent low bidder resulted from (1) a decision process tainted by improper influence or fraud, or (2) gross negligence in arriving at the decision. The *McDonald* court further refined the arbitrary and capricious test into several sub-questions, stating that a court should not interfere with the discretion of public contracting authorities in determining who is the lowest "responsible bidder" unless the decision was (1) "based upon a misconception of the law," (2) a "result of improper influence," (3) made in "violation of law," or (4) based "upon ignorance through lack

of inquiry." *McDonald,* 287 Ala. at 86, 248 So.2d at 129.

■ However, "[t]he single most important requirement of the Competitive Bid Law is the good faith of the officials charged in executing the requirements of the law." *Id. See Mobile Dodge,* 442 So.2d at 60, (courts of equity will not interfere with the exercise of discretion in the absence of fraud or gross abuse of discretion); *Mitchell,* 235 Ala. at 38, 177 So. at 154 (same); *Carson,* 232 Ala. at 317, 167 So. at 798 (same); *Inge,* 33 So. at 681 (same). The fact that a governmental authority declines to award a contract to the lowest bidder does not give rise to a presumption that the decision was somehow improper. *McDonald,* 287 Ala. at 84, 248 So.2d at 127; *Mitchell,* 235 Ala. at 38, 177 So. at 154. Thus, unless a plaintiff can demonstrate improper influence or a fraudulent scheme to eliminate fair competition, the honest exercise of discretion is presumed proper since, as Alabama courts have repeated, the Alabama legislature passed the Competitive Bid Law *not* for the benefit of an unsuccessful bidder, but for the protection of the public. *Townsend v. McCall,* 262 Ala. 554, 558, 80 So.2d 262, 265 (1955); *Carson,* 232 Ala. at 316, 167 So. at 798. *See Urban Sanitation Corp. v. City of Pell City,* 662 F.Supp. 1041, 1043 n. 3, 1044 (N.D.Ala.1986), *aff'd without opinion* 823 F.2d 556 (11th Cir.1987).[12]

The district court specifically found that the Board's decision to reject Advance Tank's bid was not the result of fraud or

---

(Ala.1988) (re-roofing of school not "an item of personal property" under section 41–16–50(a)).

**9.** We do not mean to imply that this list comprises the *only* legitimate considerations for determining whether a bidder is "responsible." We merely suggest that it represents a number of salient considerations that the Alabama legislature considers important in assessing bidder "responsibility."

**10.** The Alabama Supreme Court has on occasion described the test as whether the decision to reject the low bid is "'without reason,' or done 'impulsively,' or made 'irresponsibly,' ... or through lack of inquiry." *Int'l Telecommunications Systems,* 359 So.2d at 368, (quoting Web-

ster's Third Int'l Dictionary 110, 333, 1196 (G. & G. Merriam Co. 1971)).

**11.** The latter three cases, *Carson, Walden* and *Inge,* dealt not with the modern form of the Alabama Competitive Bid Law, but with statutes or ordinances that directed certain public authorities to award specific types of contracts to "the lowest responsible bidder" on each.

**12.** *See generally,* 64 Am.Jur.2d *Public Works and Contracts* § 67 (1972) ("honest exercise of discretion ... will not be interfered with by the courts, even if erroneous"); Bergman, *Rejecting the Irresponsible Bidder, Part I,* 57 N.Y. State Bar J. 22, 24–26 (July 1985).

improper influence. Trial Transcript at 851.[13]

Nevertheless, the district court found a gross abuse of discretion under the "ignorance through lack of inquiry" test articulated in *McDonald.* The court rejected each of the three reasons the Board offered to explain its determination that Advance Tank was not a "responsible bidder."[14]

In a letter to Advance Tank dated March 30, 1989, the Board explained that "we [the Board] would be derelict in our responsibilities to our customers if we awarded a contract of this complexity to a company which, to the best of the Board's knowledge[,] is not experienced in the construction of water treatment plants." The bidding documents specified that the "contractor must be experienced in constructing the work [specified in the bidding documents]," and stated that the contractor "must have experience in all phases of the work." Plaintiff's Exhibit 7, ¶ 1.05. In addition, the Board reserved the right to reject any bid "because the bid is not responsive or the bidder is unqualified or of doubtful financial ability or fails to meet any other pertinent standard or criteria." *Id.* at ¶ 16.1.

The record indicates that the Board was uncertain whether it could award the contract to *any* bidder since each of the bids was greater than the Board's projected budget for the project. The Board lacked a definite financing commitment for the larger-than-anticipated project budget until almost the last day of the sixty-day period in which the bids were held firm. F.W. Dougherty, the consulting engineer hired by the Board to design and oversee the project, investigated options for bringing the project within budget. He requested and received a cash flow projection from Advance Tank but did not make a substantial inquiry into Advance Tank's qualifications to construct a water treatment plant.

On March 28, 1989, Dougherty met with the Board and recommended in light of the Arab community's water needs that the Board should not scale down the project. Mike Reinhardt, the person designated by Advance Tank to oversee construction in the event that Advance Tank received the bid, appeared at the meeting to inquire whether the Board intended to pursue the project and award the bid to Advance Tank. During the course of Reinhardt's appearance at the meeting, Dougherty and the three Board members inquired into, *inter alia,* Advance Tank's and Reinhardt's experience in constructing water plants. Reinhardt assured the Board that Advance Tank had recently completed two sewer[15] plants in Florida, but admitted that Advance Tank had never constructed a water treatment plant. The record reflects that Advance Tank's principal business centered

---

**13.** The record supports a finding that the Board was not improperly motivated in granting the contract. We note that the bid accepted by the Board was only two percent higher than Advance Tank's bid. *See* footnote 1 *supra.*

**14.** The Board asserted that its decision turned on (1) Advance Tank's lack of experienced back-up personnel for key positions on the project, (2) its lack of corporate experience in constructing water treatment plants or additions thereto, and (3) the fact that Mike Reinhardt and another former employee of Reinhardt & Ward Construction Company would be involved in the project if Advance Tank received the bid. The firm of Reinhardt & Ward had defaulted after completing approximately ninety percent of an Arab sewer plant project a few years earlier. Since we find that the Board would not have been arbitrary and capricious in rejecting Advance Tank's bid solely on the basis of its concern that the project should be entrusted to a firm experienced specifically with the construc-

tion of water treatment plants, we need not consider whether the decision would be arbitrary and capricious if supported only by one or both of the remaining factors asserted by the Board. As indicated in the text, the record reflects that Advance Tank's lack of experience was a bona fide and important factor in the Board's decision and not merely a forensic endeavor to support the outcome.

**15.** We utilize the phrase "sewer plant" to refer to what is technically termed a "wastewater treatment plant." Generally speaking, a "wastewater treatment plant" processes raw sewage and other effluents for discharge into the environment, whereas a "water treatment plant" prepares water for consumption by humans. Because the phrases "wastewater treatment" and "water treatment" are similar in appearance yet distinct in meaning, we prefer to use the phrase "sewer plant" as synonymous with "wastewater treatment plant."

around the construction of above-ground storage tanks, and that Advance Tank had only recently become involved in utility construction after Reinhardt joined the company in 1987. Reinhardt invited the Board to contact John Fisher, Advance Tank's vice-president, for additional references and information concerning the firm's qualifications. Reinhardt also offered to transport Board to Florida at Advance Tank's expense to observe first-hand the quality of its work on the aforementioned sewer plants.

After Reinhardt departed from the meeting, Dougherty recommended that if the Board decided to pursue the project as bid, it should reject Advance Tank's bid because the company lacked sufficient experience and qualifications in constructing water treatment plants. Dougherty emphasized to the Board that Advance Tank's experience in constructing a *sewer* plant (or an addition thereto) did not readily translate into experience in constructing an addition to an existing *water* plant. According to one Board member's testimony, Dougherty convinced the Board that the lack of specific experience could be critical since it is "difficult to tie on to an operating water treatment plant, because if a foul up were made there, then your city would be without water, if a tie-on were made incorrectly." Trial Transcript at 647.

The next day, on March 29, 1989, Arab's water works manager informed the Board in a special meeting that he had received a commitment for the financing necessary to carry out the project as originally specified. The Board thereafter voted to reject Advance Tank's bid without further inquiry into the company's qualifications or experience.

The district court heard extensive testimony regarding the similarities and differences between the construction of sewer plants and water treatment plants,[16] as well as evidence comparing Advance Tank's experience in constructing above-ground water tanks and its relative inex-

perience in constructing the type of below-ground water storage tanks needed for Arab's water treatment plant. We need not restate the evidence. The court made the following finding of fact regarding the transferability of experience with each type of construction:

> Although there are significant differences between the purposes and configurations and appliances within [sewer] facilities and water treatment facilities, they have many more similarities than they do differences. They are in the same *genus* in the construction industry, and they require very similar techniques and understanding of construction principles.

Trial Transcript at 838. We accept this finding as not clearly erroneous. Nor do we quarrel with the court's implicit finding that a company qualified to build a sewer plant is presumptively qualified to build a water plant.

Although the Alabama Supreme Court has articulated a reasonably precise standard of review that protects honest exercises of informed discretion while carrying out the public policy behind the Competitive Bid Law, the actual holdings of its cases render little guidance to our disposition of this case. From *Carson* to *Mobile Dodge*, each of the cases discussed above concerned discretion in the choice of bidding *specifications* and/or the selection of one *commodity* or *good* over a lower priced one of similar but not identical quality and features. The choice of the appropriate product characteristics for a particular purpose involves an evaluation of known, objective features and familiar uses.

■ The choice of a qualified, responsible contractor for a specialized construction project entails, to a great extent, the selection of "goods" "sight unseen." Such decisions are entitled to the application of a standard of review that is sensitive to the

---

**16.** Testimony at trial indicated that water treatment plants require more sophisticated piping, instrumentation, chemical feed lines, and concrete finishing work than sewer plants. The evidence also suggested, however, that the general engineering and construction experience required to build either type of plant are similar.

concerns of the Board in selecting a company to carry out the task. Even tightly drawn bidding specifications and surety bonds cannot adequately protect against the forced selection of a contractor later discovered to be "irresponsible" or that performs unsatisfactory work. In the absence of improper influence, the Board need not be correct in its assessment of a bidder's "responsibility"; it need only have bona fide, rational, and articulable reasons for its decision.

We hold that the Board was not arbitrary and capricious in insisting that the firm chosen to undertake the project have experience in constructing a water treatment plant. The bidding documents gave fair warning that the Board sought such experience, and we find that under Alabama law a court may not substitute its judgment for the Board's discretion in making such a quasi-technical decision. *See Mobile Dodge,* 442 So.2d at 60 (" 'To grant such relief would be to substitute the judgment of the court and its process for the judgment and discretion ... as to technical matters within the field of engineering.' ") (choice of cars made with torsion bar suspension system over make of car with unitized body), (quoting *Carson.* 232 Ala. at 317, 167 So. at 798 (choice of specific type of water pipe couplings)).[17]

We are sensitive to the district court's evaluation that the Board's decision was "the product of less than a thorough and careful consideration," and we agree with the court's observation that the casual rejection of a low bidder can frustrate the policy behind the Competitive Bid Law. The Board apparently labored under time constraints that were entirely avoidable; it also failed to investigate carefully Advance Tank's qualifications and experience. We agree that the Board's decisionmaking process was less than ideal. Nevertheless, even with the luxury of hindsight we can see that Advance Tank lacked corporate experience in the construction of water treatment plants. Even if the Board had investigated Advance Tank with more care, it would have found a lack of the type of experience that the Board insisted upon; therefore, the decision to reject Advance Tank on that basis was not arbitrary and capricious.[18]

## CONCLUSION

The decision of the district court is REVERSED.

---

**17.** *See also, Int'l Telecommunications Systems,* 359 So.2d at 367 (choice between different makes of radio crystals); *McDonald,* 287 Ala. at 83, 248 So.2d at 126–127 (choice between different makes of tractors for highway mowing); *Mitchell,* 235 Ala. at 38, 177 So. at 154 (choice between different makes of heavy duty trucks).

**18.** We confine our review to the particular facts in the record before us. We need not speculate as to the outcome of our review if the record evidence had disclosed that the Board's less than careful investigation had resulted in a completely incorrect assumption regarding a central factor in its decision to reject the apparent low bidder.