738 So.2d 854 (1999)
Mark ANDERSON
v.
FAYETTE COUNTY BOARD OF EDUCATION and The Trane Company, Inc.
1980194.
Supreme Court of Alabama.
June 11, 1999.
*855 Clatus Junkin and Charles E. Harrison of Junkin & Harrison, Fayette, for appellant.
Donald B. Sweeney, Jr., Rhonda Pitts Chambers, and David P. Condon of Rives & Peterson, P.C., Birmingham, for appellees Fayette County Board of Education and Bobby Hathcock.
Walter J. Sears III and Douglas E. Eckert of Bradley, Arant, Rose & White, L.L.P., Birmingham, for appellee The Trane Company.
HOUSTON, Justice.
The plaintiff Mark Anderson appeals a summary judgment against various claims he made stemming from an alleged violation of the Alabama Competitive Bid Law by the Trane Company and the Fayette County Board of Education. We affirm.
When reviewing a summary judgment, we examine the evidence in the light most favorable to the nonmovant. Scott v. Villegas, 723 So.2d 642, 643 (Ala.1998). In this case, however, the facts are not in dispute. Therefore, the only question before us is whether the defendants, Trane and the Board, were entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P.; Ex parte Coleman, 705 So.2d 392, 394 (Ala.1997).
In December 1995, Fayette County Superintendent of Education Bobby Hathcock and members of the Fayette County Board of Education met with representatives from Trane, a provider of air-conditioning, heating, and ventilation equipment. The purpose of the meeting was to discuss the sale of air-conditioning and heating equipment and services to Fayette County. During the meeting, Trane told the Board that other customers had obtained opinions from attorneys that indicated contracts such as the one Trane uses would not be subject to the Alabama Competitive Bid Law ("the Bid Law"), codified at Ala.Code 1975, § 41-16-20 et seq.
In February 1996, the Board entered into a contract with Trane whereby the Board would pay Trane $35,750 to perform an "energy audit." In performing this "energy audit," Trane 1) analyzed the existing consumption of energy by the Fayette County School System's facilities; 2) made detailed reports of all the findings; and, based on those findings, 3) made recommendations as to what actions, including the installation of new equipment, could be taken to reduce, or make more efficient, the energy consumed. Included in the "energy audit" agreement was the understanding that if the Board entered into the "larger agreement" with Trane described below, then the $35,750 would be rolled into the total cost, which would then be financed; otherwise, the Board would be immediately liable to Trane for the full $35,750.
In June 1996, the Board decided to enter into that "larger agreement," known as a "Performance Agreement for Comfort from Trane" ("PACT"). The PACT provided, in pertinent part:
"The parties acknowledge and agree that the essence of this Agreement is to procure the professional services of Trane to design and, as a necessary component, install systems and equipment to achieve specified operational and energy savings. Trane's professional services shall include, without limitation, the following: survey of all specified schools for HVAC equipment, lighting, controls; prepare computer models of the schools based on the buildings' current operation and their respective operation subsequent to the retrofit; consultation with Alabama [P]ower [C]ompany to seek reduced utility rates; consult with architect for design approval; consult with Customer's facilities manager, consultation with mechanical contractor; prepare engineered *856 drawings for installment of controls, and HVAC equipment; monitoring of all relevant utility bills for the Term and such applicable Renewal Option exercised by Customer; weekly visits to Customer to review building automation system event logs for each system; semi-annual visits to the school to check calibration and proper operation; semi-annual visits to the school to monitor HVAC equipment; preparation and presentation of annual reports to Customer on the effect of energy conservation measures; and monthly meetings with Customer's facilities manager to discuss operations of the buildings over the Term and such applicable Renewal Option exercised by Customer.
"No later than November 26, 1996 (`Substantial Completion'), Trane shall have designed and performed such of the foregoing professional services and work as appropriate to substantially complete installation of the Equipment and such other work as Trane deems appropriate to achieve the Savings guaranteed Customer (hereinafter, collectively, the `Work') as defined in this Agreement. Trane's obligation hereunder is limited to the Work as defined herein. Excluded from the Work are any modifications or alternations[alterations] to the Premises (not expressly included within the Work as defined) that may be required by operation of the Americans With Disabilities Act or any other law or building code(s)."
In accordance with the PACT, the Board entered into a Maintenance Agreement with Trane on August 8, 1996. Pursuant to this agreement, Trane would provide monitoring and monthly bill analysis, for approximately $20,880 per year. Both the PACT and the Maintenance Agreement were for a 3-year term, renewable for up to 10 years.
Anderson, a taxpayer in Fayette County, filed this action in the Fayette Circuit Court, against Trane and the Board, alleging that the contracts between Trane and the Board violated the Bid Law. Anderson requested not only injunctive relief, but also damages based on claims of fraud, misrepresentation, and conspiracy. The trial court entered a summary judgment for the defendants, basing it on a conclusion that the Board did not abuse its discretion in determining that the contracts with Trane were not subject to the Bid Law. While we affirm the summary judgment, we hold that "abuse of discretion" is not the appropriate standard for determining whether the contract violates the Bid Law.
Both Trane and the Board argue that the Board did not abuse its discretion in not letting out for bid the contracts it eventually signed with Trane. They argue that an "abuse-of-discretion" standard is the only appropriate standard to be used when reviewing any decision of the Board concerning the Bid Law. In support of this argument, Trane and the Board cite several cases, including Ericsson Ge Mobile Communications, Inc. v. Motorola Communications & Elec., Inc., 657 So.2d 857 (Ala.1995); Crest Constr. Corp. v. Shelby County Bd. of Educ., 612 So.2d 425 (Ala. 1992); and International Telecomm. Sys. v. State, 359 So.2d 364 (Ala.1978).
However, those cases refer only to the Board's discretion in awarding a contract that has already been let out for bid. According to the Bid Law, the Board clearly has the discretion to determine the "lowest responsible bidder." See Ala.Code 1975, § 41-16-20. This does not mean that the Board's decision that a contract meets one of the exceptions found in § 41-16-51 will be given some presumption of correctness and thus will be reviewed under an abuse-of-discretion standard.
The only case mentioned by the defendants wherein this Court has used an abuse-of-discretion standard when reviewing a Board's determination that a contract fits an exception to the Bid Law is Union Springs Tel. Co. v. Rowell, 623 So.2d 732 (Ala.1993). In that case, the Union Springs Telephone Company ("USTC") sued the Alabama Department of Finance, seeking to enjoin the Finance Department *857 from giving effect to a contract entered into between the Alabama Department of Corrections and Talton Communications (a competitor of USTC) to provide pay-telephone services. USTC alleged that the contract violated the Bid Law because it had not been let out for bid. The Finance Department defended by claiming that this contract did not have to be let out for bid because it was entered in response to an "emergency"; see Ala.Code 1975, § 41-16-23, which this Court stated in Union Springs, "allows a state agency to enter into a contract without first seeking competitive bids `in case of emergency affecting public health, safety, or convenience,' provided that the state agency declares in writing the nature of the emergency." 623 So.2d at 733 (quoting the trial court's order). This Court wrote in Union Springs:
"USTC contends that the trial court erred [in entering a judgment for the Finance Department] because it believed that it could not `look behind' the Department's determination that the lack of a viable contract for pay-telephone services at BCCF constituted an emergency. This Court wishes to emphasize that these determinations are reviewable by the courts; if they were not, the Competitive Bid Law would become practically useless, because the State could declare an emergency any-time it wanted to and thus dispense with the bidding process. See Reynolds Construction Co. v. Twin Falls County, 92 Idaho 61,437 P.2d 14 (1968). The scope of review is limited, however, because a proclamation of a state agency is clothed with a presumption of correctness and may not be overturned unless it is shown to be unreasonable, arbitrary, or capricious. Benton v. Alabama Board of Medical Examiners, 467 So.2d 234 (Ala.1985)."
623 So.2d at 734.
Although in Union Springs we did apply an abuse-of-discretion standard to the state agency's determination that it faced an "emergency," Union Springs should not be used to apply that standard to any exception to the Bid Law that someone may claim exists.
The exception at issue in the present case is found at § 41-16-51(a)(3); it provides an exception to the competitive-bid requirement for
"[c]ontracts for the securing of services of attorneys, physicians, architects, teachers, superintendents of construction, artists, appraisers, engineers, consultants, certified public accountants, public accountants, or other individuals possessing a high degree of professional skill where the personality of the individual plays a decisive part."
Determining whether a situation is an "emergency," within the meaning of that word as it is used in § 41-16-23, is essentially different from making a "determination" whether an individual is an attorney, a physician, an architect, or an engineer, etc., as listed in § 41-16-51(a)(3). While the former issue would inherently vest a state entity with substantial discretion, which would prompt the use of an abuse-of-discretion standard on review, the latter would not. In fact, none of the exceptions listed in § 41-16-51(a) would vest a state entity with discretion. Rather, those exceptions involve situations where the nature of the exception's subject is already determined, such as contracts for: the purchase of insurance [(a)(1)]; the purchase of election ballots [(a)(2)]; the purchase of products made by the blind under the supervision of the Alabama Institute for Deaf and Blind; the purchase of maps from a federal agency [(a)(7)]; and the purchase of manuscripts [(a)(8)]. It would be foolish to maintain that an Alabama court must be highly deferential when reviewing a state entity's "determination" of whether a contract is one concerning "sanitation or solid waste collection... and disposal" [(a)(10)], because a contract either is or is not one of that nature, independent of a Board's determination.
Therefore, we see no reason to apply an abuse-of-discretion standard to the exceptions *858 listed in § 41-16-51, and we hold that the trial court erred in applying an abuse-of-discretion standard in this case. However, even examining the facts under a de novo standard of review, we conclude that the trial court properly entered the summary judgment for the defendants.
Anderson concedes that the "energy audit" contract might be considered a contract for engineering services or a contract requiring a "high degree of professional skill." § 41-16-51(a)(3). With regard to the Maintenance Agreement, we think that it is inexorably intertwined with the PACT. This is because the Maintenance Agreement concerns the upkeep of the equipment, most of which is Trane's, that was installed under the PACT.
The main area of contention, then, surrounds the nature of the PACT. Anderson contends that the PACT is basically a contract under which Trane removed old equipment, installed new equipment, and did some paving and electrical work. There is no doubt that Trane performed those tasks. However, there is much more to the PACT (which is the central agreement between Trane and the Board) than Anderson suggests. The language from the PACT, as quoted above, details not just physical labor, but also various activities designed to achieve one particular goal that would require a "high degree of professional skill where the personality of [Trane] would play[] a decisive part" (§ 41-16-51(a)(3)): operational and energy savings. Some of these activities include: 1) extensive surveying of the facilities to determine what equipment should be used and where it should be located; 2) preparing computer models of the schools to demonstrate the efficiency of the facilities' heating and air conditioning systems "before and after" the installations; 3) consulting with Alabama Power Company, architects, mechanical contractors, and the Board's facilities manager; 4) continued monitoring of all of the facilities' utility bills for the entire term of the contract; 5) continued monitoring of the system event logs for every installed system; and 6) continuing to prepare and present reports to the Board regarding the effect of "energy conservation measures."
In short, we believe that the Board purchased more than just equipment; rather, the Board purchased what its members claimed in deposition to have purchased: a "comprehensive energy-savings plan" under which they would rely on Trane's expertise and would turn over to Trane the job of making and keeping the Board's facilities' heating and air-conditioning systems efficient. This reading of the PACT is bolstered by the fact that Trane guaranteed that its design would work; that is, Trane agreed that if the operational and energy savings did not reach $167,498 per year for up to 10 years, then Trane would pay to the Board an amount equal to the deficiency.
In support of our holding, we note that we are persuaded by an attorney general's opinion cited by the defendants. We have recognized that "[w]hile an opinion of the attorney general is not binding, it can constitute persuasive authority." Alabama-Tennessee Natural Gas Co. v. Southern Natural Gas Co., 694 So.2d 1344, 1346 (Ala.1997) (citing Poe v. Grove Hill Mem. Hosp. Bd., 441 So.2d 861, 863 (Ala.1983)).
In Op. Att'y Gen. No. 84-00262 (1984), the attorney general dealt with a situation very similar to the one we have before us:
"In a recent letter addressed to this office you requested an opinion regarding an interpretation of the Alabama Competitive Bid Law found in Code of Alabama 1975, § 41-16-20 through § 41-16-32. Your letter reads, in pertinent part, as follows:
"`[P]lease accept this letter as a request for an Attorney General's Opinion as to whether a five-year public contract for professional services involving the purchase of integrated sophisticated scientific equipment and services requiring a high degree of professional skill is exempt from the Competitive Bid Law....

*859 "`The contract involved in this request is proposed by ERIC Engineering. It is described in detail in the enclosed memorandum and presents a unique bundle of highly sophisticated professional services to customers including guaranteed utility cost savings to the customer over a five-year term, engineering services, scientific monitoring, implementation of a utility cost containment program, and financial services for the customer to pay for the program. The financial services include a purchase by the customer of all monitoring and control equipment incidental to the utility cost containment program over the five-year term through a lease-purchase installment contract between the customer and Continental Leasing Corporation....
"`The specific issue which we request the Attorney General to address is whether a five-year public contract for professional services, which includes as part of the service the purchase of highly sophisticated monitoring and control equipment incidental to and inextricably integrated with the service, is exempt from the Competitive Bid Law....' (Emphasis added [in the attorney general's opinion].)
"Code of Alabama 1975, § 41-16-21(a), provides that competitive bids shall not be required for contracts for the securing of services of engineers. Therefore, based on the representations contained in your request letter it is my opinion that the proposed contract between Alabama A & M University and ERIC Engineering is exempt from competitive bid pursuant to § 41-16-21, supra. However, it should be noted that public agencies must solicit competitive bids in those instances where the primary purpose of the contract is to purchase equipment which could be supplied by more than one vendor and the professional services are merely incidental to the purchase of said equipment. In addition competitive bids are required on equipment in those instances where it is possible to purchase the equipment in a separate contract from the professional services. The mere fact that it is inconvenient to purchase the equipment under a separate contract does not exempt the purchase of the equipment from the competitive bid law. This office does not have the expertise needed to determine if the equipment in question is capable of being purchased by bid or not. This decision is a factual one which must be made by the purchasing authority."
(Emphasis added except as indicated otherwise.)
With regard to Anderson's other claims, our holding that the agreements between Trane and the Board meet the § 41-16-51(a)(3) exception renders these claims invalid. However, Anderson contends that even if the contracts can be considered contracts for "engineering services," the contracts are still void because Trane was not licensed or certified to perform "engineering services" in Alabama at the time the contracts were performed. See Ala.Code 1975, § 34-11-2(a).
Trane correctly points out that engineers are required to be registered, but not corporations; a corporation needs only a certificate of authorization assuring that those in charge of engineering for that corporation are registered engineers. Ala. Code 1975, § 34-11-9. In this case, Trane subcontracted the engineering work to Sain Engineering, a firm that utilizes registered engineers. While it is true that Trane did not have a certificate of authorization when it entered into the contracts with the Board, Trane later obtained one. Like the trial court, we do not see the requirement of this certificate as being a protective measure akin to an engineer's registration required under § 34-11-2(a) or a corporation's qualification to do business in Alabama, required under § 10-2B-15.02(a). Therefore, we decline to hold that the contracts between Trane and the Board were void on the basis that Trane did not hold a certificate of authorization *860 at the time it entered into the contracts with the Board.
AFFIRMED.
HOOPER, C.J., and MADDOX, KENNEDY, COOK, and BROWN, JJ., concur.
SEE and LYONS, JJ., concur in the result.
JOHNSTONE, J., dissents.
SEE, Justice (concurring in the result).
I agree with that part of the majority opinion that holds that the trial court erred by applying an "abuse-of-discretion" standard in this case. I disagree with that part of the majority opinion that holds that the contracts here at issue are exempted from the Alabama Competitive Bid Law, Ala.Code 1975, § 41-16-20 et seq. Nonetheless, because injunctive relief is no longer available, and because Mark Anderson's tort claims fail as a matter of law, I concur in the result.
In 1996, the Fayette County Board of Education (the "Board") entered into a series of contracts with the Trane Company ("Trane"). Under the first contract (the "Audit Contract"), Trane agreed to analyze the existing energy consumption of the Fayette County School System's facilities and to make recommendations as to what could be done to reduce energy consumption at those facilities. In return, the Board agreed to pay Trane $35,750. Under the second contract (the "Performance Contract"), Trane agreed to carry out the recommendations it made under the Audit Contract, including the removal of old heating, air-conditioning, and lighting equipment, and the installation of new heating, air-conditioning, and lighting equipment. Trane also guaranteed that the Board would save at least $167,498 per year in energy costs. In return, the Board agreed to pay Trane $1,246,773. Under the third contract (the "Maintenance Contract"), Trane agreed to provide monthly performance monitoring, monthly utility-bill analysis, and various quarterly reports and recommendations. In return, the Board agreed to pay Trane $20,880 annually for 10 years, adjusted upwards at 4% each year. Mark Anderson is a taxpayer of Fayette County, and, he says, a competitor of Trane; he sued Trane and the Board, seeking to have the Performance Contract declared null and void and seeking damages to compensate for harm he says the county taxpayers had incurred as a result of the Board's failure to competitively bid out the Performance Contract. Specifically, Anderson asserted claims of fraud, misrepresentation, and conspiracy, all based on Trane's statements to the Board indicating that the contract was exempted from the requirements of the Competitive Bid Law. Anderson later amended his complaint to seek a permanent injunction against enforcement of the Performance Contract.
The Competitive Bid Law contains several exceptions to its general requirement that contracts for the purchase of goods or services in excess of $7,500 be awarded on the basis of competitive bids. The majority relies on the exception provided by Ala. Code 1975, § 41-16-51(a)(3), in holding that the contracts entered into in this case are exempted from the Competitive Bid Law. I disagree. Section 41-16-51(a)(3) provides that the Competitive Bid Law does not apply to
"[c]ontracts for securing services of attorneys, physicians, architects, teachers, superintendents of construction, artists, appraisers, engineers, consultants, certified public accountants, public accountants, or other individuals possessing a high degree of professional skill where the personality of the individual plays a decisive part."
Although the plain language of the exception is limited to the purchase of specific services only, the exception arguably extends to the purchase of nonexempted services or equipment that are both "incidental to and inextricably integrated" with a purchase of exempted services. See Op. Att'y Gen., No. 84-00262 (1984) (expressing the opinion that a contract securing *861 professional services was exempted from the Competitive Bid Law even though it included the purchase of equipment that was "incidental to and inextricably integrated with the service"); see also Alabama-Tennessee Natural Gas Co. v. Southern Natural Gas Co., 694 So.2d 1344, 1346 (Ala.1997) ("While an opinion of the attorney general is not binding, it can constitute persuasive authority."). However, the exception does not extend to purchases "where the primary purpose of the contract is to purchase equipment which could be supplied by more than one vendor and the professional services are merely incidental to the purchase of said equipment." Op. Att'y Gen., No. 84-00262 (1984). Nor does the exception extend to purchases "where it is possible to purchase the equipment in a separate contract from the professional services." Id.
The contracts in this case involve purchases of nonexempted services and equipment that are not merely incidental to the purchase of any exempted services. An examination of Trane's own itemization of expenditures under the Performance Contract reveals that $249,355, at most, was spent on exempted engineering services.[1] The rest of the nearly $1 million in expenses was expressly allocated to nonexempted purchases, including the purchase of Trane equipment ($242,729), the purchase of non-Trane equipment ($12,398), mechanical work ($344,667), electrical work ($78,241), lighting work ($305,381), and work on air-lock doors ($16,000). Instead of being incidental to the purchase of the engineering services, the nonexempted purchases appear to be the primary purpose for the Performance Contract.
The majority ignores Trane's own itemization of expenses, characterizing the Performance Contract as a "comprehensive energy-saving plan" under which Trane guaranteed that the Board would save $167,498 a year in energy expenses. 738 So.2d at 858. The majority concludes that such a plan falls under the exemption provided by § 41-16-51(a)(3) as a contract for professional services "where the personality of the individual plays a decisive part." However, it is clear that Trane's personalities, or the personality of its employees, played no decisive part in the Board's decision to enter into these contracts. Neither the Board nor Trane asserts that anything separates Trane equipment or services from those provided by other similar companies. In fact, it appears that Trane actually subcontracted out the engineering services, thus negating any suggestion that "the personality of the individual [engineer] play[ed] a decisive part." § 41-16-51(a)(3); see Op. Att'y Gen., No. 84-00262 (1984). Moreover, nothing in the record indicates that the Board could not "purchase the equipment in a separate contract from the professional services." Op. Att'y Gen., No. 84-00262 (1984).
Instead, Trane, the Board, and the majority of this Court point to the financial consideration of "guaranteed savings" as the rationale supporting the Performance Contract. Such a consideration, however, falls squarely within the primary purpose of the Competitive Bid Law to assure quality and economy. See Arrington v. Associated Gen. Contractors of America, 403 So.2d 893 (Ala.1981) (holding that the legislature's intent in passing the Competitive Bid Law was to ensure that governmental entities secured the best-quality equipment at the lowest possible price). Thus, the Board should have bid out the Performance Contract, to determine whether a responsible bidder would offer either greater guaranteed savings at a similar cost or the same guaranteed savings at a lower cost.
*862 Although I disagree with the majority's rationale, I concur in the result because the legislature has provided the public with only one remedy to prevent a public agency from violating the provisions of the Competitive Bid Law. "A taxpayer or a `bona fide unsuccessful bidder' may sue `to enjoin execution of any contract entered into in violation of the provisions of [Article 3, § 41-16-50 through 41-16-63].' Ala.Code 1975, § 41-16-61. This language is unambiguous." Crest Constr. Corp. v. Shelby County Bd. of Educ., 612 So.2d 425, 431 (Ala.1992) (alteration in original). Once a contract has been entered into and performance actually begun, this remedy is no longer available. See Masonry Arts, Inc. v. Mobile County Commission, 628 So.2d 334 (Ala.1993) (dismissing Competitive-Bid-Law challenge as moot after contract was executed and performance begun). The Performance Contract was effective on May 31, 1996, and was signed by the parties in early June of that year. Anderson admitted during his deposition that he was aware of the Performance Contract long before the contract was entered into. Despite this knowledge, Anderson did not object at any of the public meetings held on the subject, and did not file his lawsuit until several months after Trane had begun its performance of the contract. Anderson never requested a preliminary injunction, and did not even request a permanent injunction until he amended his complaint in October 1996. The trial court denied Anderson's request for a permanent injunction, and the trial court's order was not superseded by Anderson's appeal. See Masonry Arts, 628 So.2d at 335 (holding that a similar denial was not superseded because the appellant did not seek a stay of the trial court's order). Trane has now completed the installation of the energy-saving measures provided under the Performance Contract, and the injunctive relief Anderson sought is no longer available. Accordingly, Anderson's appeal, insofar as it relates to the trial court's denial of an injunction, is moot and should be dismissed.
Anderson also argues that the trial court erred by entering a summary judgment with respect to the derivative claims of fraud, misrepresentation, and conspiracy he brought as a county taxpayer. Anderson correctly notes that the Competitive Bid Law does not preclude claims based on intentional wrongful conduct by persons involved in a bidding process. See Spring Hill Lighting & Supply Co. v. Square D Co., 662 So.2d 1141 (Ala.1995). Anderson's tort claims, however, fail as a matter of law.[2] All three tort claims seek damages for Trane's representing to the Board that the Performance Contract was exempted from the Competitive Bid Law. However, a misrepresentation of the law is actionable only if there is a confidential relationship between the parties or if the representing party is an attorney. See Epps Aircraft, Inc. v. Exxon Corp., 859 F.Supp. 533, 538 (M.D.Ala.1993). It is undisputed that Trane is not an attorney, and Anderson presented no evidence indicating that Trane had a confidential relationship with the Board. Accordingly, the trial court properly entered the summary judgment in favor of Trane and the Board on these claims.
LYONS, J., concurs.
NOTES
[1] The itemization provided by Trane contains an entry for $249,335 for "Engineering and `Mobilization Down Payment.'" It is unclear how much, if any, of this amount was actually for engineering services. In fact, Trane's project manager testified that this entry actually represented a 20% down payment on the contract and that the only engineering involved in any of the contracts was pursuant to the Audit Contract, which cost the Board $35,750.
[2] The trial court held that Anderson lacked standing to maintain his tort claims against the Board and Trane because Trane's alleged misrepresentation was made not to Anderson but to the Board. My conclusion that the alleged misrepresentation was, as a matter of law, not actionable makes unnecessary any discussion of whether Anderson had standing to assert these claims.